## FREEDMAN *v.* STATE

[No. 154, October Term, 1949.]

*Decided May 10, 1950.*

*Rehearing denied June 14, 1950.*

The cause was argued before MARBURY, C. J., COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Walter L. Green,* with whom were *Green, Whalin, Babcock & Bell, Henry A. Babcock* and *Edward C. Bell, Jr.,* on the brief, for the appellant.

*Kenneth C. Proctor, Assistant Attorney General,* with whom were *Hall Hammond, Attorney General, John H. T. Briscoe, State's Attorney for St. Mary's County,* and *Thomas C. Carrico, State's Attorney for Charles County,* on the brief, for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

Appellant was convicted by the Circuit Court for Charles County on the charge of receiving stolen goods. From the judgment and sentence he appealed.

The offense charged occurred in St. Mary's County, but the case was removed to Charles County and was there tried before two members of the Circuit Court sitting without a jury. The evidence pertinent to the questions raised here may be summarized as follows:

James F. Garner and Charles W. Garner on the 18th day of July, 1949, were operating a store at Tall Timbers, St. Mary's County; a place where two roads intersect. Morton Freedman, a young man 26 years of age, resides in Baltimore, but for some time had been employed by

his brother, Bernard Freedman, in the Tall Timbers Tavern as a manager-bartender. That Tavern is located directly across the road from Garner Brothers Store. Philip S. Hayward lived in a house adjacent to the store. About 4: a. m. on July 18, 1949, he was in the second story bedroom of his home, and his attention was attracted to a sound in the store next door. He got out of bed and went to the window and observed shadowy figures silhouetted in the light within the store belonging to Garner Brothers. He saw two men apparently moving something heavy. He then called the Sheriff of St. Mary's County and shortly thereafter observed some object being carried out and dropped against the end of a car that was parked near the store. Sheriff Willard B. Long received a call at about 6 minutes to 4 o'clock, proceeded to Garner's Store, investigated and found that the door of the store had been pried open with some instrument strong enough to force the door open which had left the imprint of the instrument in the door and facings. The safe had been removed. This had contained papers, cash, slugs, coins, a blue print and other items. He testified that the screw driver found in appellant's car fitted the markings on the door facing and on the door itself. Larry E. Jackson, a detective sergeant of the Maryland State Police, testified that he received a call on the early morning of the same day requesting an investigation of the alleged crime; that he proceeded to Garner Brothers Store. He testified to finding two automobiles, listed with the State Police as stolen, on a side road about a mile north of Garner Brothers Store and stated after examining these two automobiles and a safe which was open and lying on the ground beside these cars, he then went on to Garner Brothers Store at Tall Timbers. He further testified that he found the exit side of the double door, leading into the front of the Garner Brothers Store, open, and that "jimmy marks" appeared on the door jamb. He described the cars and the condition of the safe and the manner in which it was lying at the point where he

saw it, and stated that there was nothing in the safe at the time. Then he testified that he saw one Charles Bafford at the Tall Timbers at about 7:00 or 8:00 in the morning on July 18. He was asked who was present with him at that time, and he answered "His wife Louise Bafford and Bernard Freedman". He said he had seen them at the Tall Timbers Tavern, which was the business place of Bernard Freedman located across the road. He stated that he had seen the defendant, Morton M. Freedman, somewhere, but he was not sure where. He examined the automobile of Charles and Louise Bafford in an effort to determine if it had been used recently, and described fully his examination of that car. He repeated a statement that Bafford had made to him with reference to the parking of the car. He saw Bafford about 25 minutes of one of the following morning at New Market in St. Mary's County, when he was riding in an automobile which was stopped at a police blockade which had been established at New Market. He was asked "Who was with Bafford at the time?" And answered "The defendant, Morton M. Freedman, John P. Byars, Edward P. Wickline, and Louise Bafford the wife of Charles Bafford."

Sergeant Jackson was asked by the State's Attorney "At the time that this car was stopped at the road-block, did you have any information to lead you to believe that those who had committed the crime were still in the vicinity?" He stated that he did. He went on to say that the information that he had was a photograph of Edward P. Wickline who had been identified by Lt. Philip Hayward, although Lt. Hayward did not so testify. Sergeant Jackson further testified that Morton Freedman was driving the car which they stopped at the road-block, that the car belonged to Morton Freedman and Janet Barr, with a Baltimore address. The question was asked "After you stopped this car at the road-block, what did you do then?" The officer replied "I arrested Edward P. Wickline, John P. Byars, Charles Bafford, Louise Bafford and the defendant, Morton M. Freedman". He

arrested the parties for the theft of a safe and contents including about $3000.00, from Garner Brothers Store at Tall Timbers. He was asked "Then what did you proceed to do, after you placed them under arrest?" The Officer stated "I searched the automobile in which these parties were riding at the time they were arrested". When asked "What, if anything, did you discover in that car?", he was allowed to testify that the first thing he found in the search of the automobile was a pillow-case lying on the floor of the car in the rear seat. He testified that the pillow-case was lying in full view, and he could note a number of rolled coins, or what appeared to be rolled coins, protruding from it. He identified the pillow-case and it was received in evidence. When asked "What else did you discover?", he testified "In this bag which is offered in evidence, in addition to the coins which are now in the bag, there were a number of car tokens, slugs, foreign coins, meat tokens, and so forth, scattered throughout these coins. In addition to that, there was a quantity of material similar in appearance to safe insulation." He identified the coins and tokens, and they were admitted in evidence.

The Officer then testified that he took from the back seat of the car, a rope "* * * it was behind the front seat, in the rear-seat compartment of the automobile, on the floor. * * * where a person's feet, who was sitting in the back seat, would normally be". He stated that he found two flashlights in the rear compartment of the automobile, and that these two flashlights were on the ledge beneath the rear window. He identified the flash-lights, and they were received in evidence. When asked what else he found in the car on that occasion, he testified, "The trunk of the car was not locked; it was open; a wrecking bar, a length of pipe, a small screw driver, two punches, a hand hammer, a claw hammer, two magazines from a U. S. carbine 30 caliber rifle, 32 rounds of carbine ammunition." He said that the first place that he looked was in the glove compartment, and he produced some insulation from the safe which he had

found about a mile from the store. He produced some gloves that were taken from the trunk of the car of the defendant.

Officer Jackson was then asked, "After Morton M. Freedman and the other four persons who were in his car on this occasion were taken to Leonardtown, what was done with them there?" He answered "They were locked up in St. Mary's County jail at Leonardtown." The question was asked, "Was there at that time any examination of the person of Morton M. Freedman?" The officer stated "There was", and when asked "As a result of that examination what, if anything, was discovered?", the officer testified: "The defendant Freedman was searched at the county jail before he was locked up in a cell, and in a pocket of his trousers a roll of bills wrapped in a rubber band was taken from his pocket; that was counted and amounted to $582. In another pocket, not wrapped in a rubber band, was found $163. In addition to that, two quarters, one nickel, one dime, five pennies, were also taken from the defendant; and in addition thereto, one comb, one pencil, one set of car keys, and one towel, were also taken from the defendant".

It was put in evidence that Byars had $580.00 wrapped in a rubber band. Wickline had $582.00 similarly wrapped and Charles Bafford had $586.00 also similarly wrapped. Appellant and the Baffords had been seen together on the previous afternoon in the same automobile stopped at the road-block.

The officer then identified a burlap bag in the following words:

"This is a burlap bag containing a shirt and checks, deeds, and miscellaneous papers, which I obtained from the roadside at the entrance to the Sarah A. Turner farm near Riceville on July 19, 1949, about 10:30 A. M.".

Officer Jackson testified that when he stopped the car operated by Morton Freedman, he did not have a warrant for his arrest, and that he did not have a search warrant. Testimony showed that when this car was stopped, an officer flashed a searchlight in the defendant's face and

covered the occupants of the car with machine-guns. Officer Jackson said that he did not ask the permission of the defendant to search the car, but stated that he searched the car after he arrested the defendant, and the other occupants of the car. Many of the coins that were identified as being in the original bag, taken out of the car, were coins that were taken from slot machines.

The burlap bag picked up near Riceville was introduced for the purpose of showing that there were in it some personal checks and government checks, etc. made out to Garner Brothers. The bag, with its contents, was admitted into evidence.

Patrick Mudd, Clerk of the Circuit Court for Charles County, testified as to indictments and convictions of John P. Byars, Charles Bafford and Edward P. Wickline. He was allowed to read into evidence the docket entries and the records appearing against these other parties. Mr. Mudd read into evidence a copy of the docket entries in two cases against Edward Wickline, showing charges of breaking and entering and of grand larceny and convictions and concurrent sentences of him for a period of ten years. Indictments of Wickline, Byars and Bafford were also read into evidence.

The appellant made appropriate objections to raise the various points which are hereinafter discussed. The first of these is that the arrest and the immediate commitment to jail without a warrant and without being taken before a magistrate, were illegal, and therefore the evidence produced from the search of the automobile and of the appellant's person, were inadmissible in evidence against him. He relies primarily for this contention upon *United States v. Di Re*, 332 U. S. 581, 68 S. Ct. 222, 92 L. Ed. 210. In that case the question involved was the search of a man who was found sitting in a parked automobile in which were two other persons, one of whom had counterfeit gas ration coupons in his hand, and who told officers that he had gotten them from the third occupant. Di Re was not implicated in

any way, except by being a passenger, but when he was arrested and searched, counterfeit coupons were found on his person. The government attempted to justify the arrest and search of Di Re on the ground that he had committed a felony, namely, conspiracy, but the Circuit Court of Appeals and the Supreme Court both reached the conclusion that the officers had no ground at the time for supposing that Di Re had committed a felony, and that so far as they knew at the time, there were no coupons in his possession. The Supreme Court, in its discussion, however, indicated that it would have been a valid arrest had the felony been one which the officers had reasonable grounds to believe the suspect had committed. In the case before us the officers had reason to believe that several felonies had been committed. Two automobiles had been stolen and these stolen automobiles had been involved in a housebreaking, and property valued in excess of $3000 had been stolen. Felonies, therefore, had been committed, and there was reason to believe that a man named Wickline and several others were involved. When the car, which was driven by the appellant, was stopped, Wickline was in it. There was, therefore, reasonable ground for the officers to suppose that not only Wickline, but also the driver of the car in which he was making his escape from the County, had been engaged in a felony. The arrest of the appellant was, therefore, lawful, and consequently both the search of his automobile and the search of his person were lawful. *Callahan v. State,* 163 Md. 298, 162 A. 856.

We have had occasion in a number of recent cases to discuss constitutional safeguards against illegal search, and seizure. Some were cases where there was no search warrant. It is not necessary now to enter into any further consideration of the subject other than to say that it has never been held by this Court or by the Supreme Court of the United States, that, as an incident of lawful arrest, the party arrested or the location within his immediate use and possession cannot be searched for the

twin purposes of disarming him and of preventing the destruction of evidence of the crime. *U. S. v. Rabinowitz,* 339 U. S. 56, 70 S. Ct. 430, 94 L. Ed. 653. In the recent case of *Johnson v. State,* 193 Md. 136, 66 Atl. 2d 504, although we held that the search in that case was too extensive, we emphasized a quotation from *Callahan v. State, supra,* stating that such a search can be lawfully made.

Section 5 of Article 35 of the 1947 Supplement of the Annotated Code prohibits the admission in the trial of misdemeanors of evidence obtained as a consequence of any illegal search or seizure. The appellant was eventually tried not for a felony, but for a misdemeanor, but there is nothing in Article 35, Section 5 which prohibits the admission of evidence in the trial of a misdemeanor obtained by a search which was lawful at the time it was made.

The objection that the appellant was first taken to the station house before his person was searched, becomes rather ridiculous when we consider the alternative, which would be to search him then and there on the roadside. Obviously, in the interest of decency at least, a person arrested should not be completely searched on a public highway, unless it is necessary from the nature of the situation. The mere fact that appellant was not instantly taken before a magistrate and charged does not invalidate the search. It must be borne in mind that this automobile was stopped at twenty-five minutes of one in the morning, which might be a reason for the procedure which was adopted. In any event, we think the evidence was admissible.

The second question raised by appellant has to do with the admission of the contents of the burlap bag. This bag contained papers which came from the Garner store. One of the troopers testified that just before appellant's car reached the road-block, he heard a dull noise as if some object had struck the road. Another officer who arrived after the car had been stopped saw a brown looking object lying in the middle of the

road. The first officer said that after the occupants of the car had been taken away, he and the deputy sheriff drove back along the road over which the car had approached the road-block. They pulled to the side of the road and the deputy sheriff picked up a burlap bag, showed it to him, pulled some blue article out of it, put the article back, and left the bag on the side of the road. The deputy sheriff confirmed this testimony. Subsequently, a man who had no connection with the matter drove by, saw the bag, and did what the officer neglected to do; he examined it. He saw that some of the things in it belonged to the Garners, and apparently, with only the thought in mind of getting rid of it, drove away with it on another road some distance away, and left it. A woman driving up this road found it, gave it to her cousin, and he and the postman turned it over to the authorities. The identification of the bag was thoroughly traced in the evidence from the time it was first seen until it was put in evidence, and the officers' testimony indicates that it was originally in appellant's car and was thrown out.

The rule as to the admissibility of such evidence was laid down in the case of *Goldstein v. State*, and *Bevans v. State*, unreported, 179 Md. 697, 22 A. 2d 471, 472. In that case some articles were thrown from a car which was being followed by the police. Police subsequently looked at the place where something had been thrown, and found some gloves and some skeleton keys. The argument was made that the evidence of throwing, or dropping at the spot and the subsequent finding were not sufficient to connect the accused with the articles found. But the Court denied that contention and speaking through Chief Judge Bond, said "Nothing was lacking to a complete showing of connection except testimony that the men had the articles in their possession previously. Probability is the only requirement, however, and here the probability amounts to little short of certainty. And if there was any room for doubt, the decision was one on the weight of the evidence, not on any question of

admissibility." This conclusion has been followed in later cases. See *Cox v. State,* 192 Md. 525, 64 A. 2d 732, *Edwards v. State,* 194 Md. 387, 71 A. 2d 487, *Purviance v. State,* 185 Md. 189, 193, 44 A. 2d 474.

Appellant also contends that the evidence of docket entries, indictments and records of convictions of the persons who were in the car with the appellant, and who were convicted of breaking and entering in the Garner store, and larceny from the Garners, should not have been admitted. The basis for admission of these records could have been only to show that the goods were stolen, which is an essential part of the crime of receiving stolen goods. However, that is not the proper method of proof. A party charged with receiving stolen goods is entitled to have the fact that the goods were stolen proved by the testimony of witnesses who confront him, and he is entitled to have the opportunity of cross-examining such witnesses. Records of convictions do not meet these requirements. *Kirby v. United States,* 174 U. S. 47, 19 S. Ct. 574, 43 L. Ed. 890; *Rex v. Turner,* Moody's Crown cases, 347, *Keable v. Payne,* 8 Ad. & Ell. 555-560, *Commonwealth v. Elisha,* 3 Gray 460, 69 Mass. 460, *State v. Newport,* 4 Har., Del., 567. On the authority of these cases, which seem to be supported by the text writers, we are constrained to hold that there was error in admitting these indictments and records. There was other competent evidence produced of the theft, and there might be some question whether, in view of this other evidence, the record of convictions could be treated as surplusage, but we do not have to decide that question, because appellant's counsel, in the early part of the trial of the case, before any of these records were admitted, at a time when he was discussing with the court the admission of the evidence found in the car, said, speaking of the other occupants of the car, who were the ones whose convictions were admitted in evidence, "In fact, they have been convicted of felony —Wickline pleaded guilty of larceny which was felony." Since the fact of these convictions had been previously

288

admitted by counsel, the subsequent official records could not have damaged appellant, and, therefore, their admission constitutes no reversible error.

The judgment and sentence will be affirmed.

*Judgment and sentence affirmed with costs.*